UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| ROBIN M. VERMEER,<br><br>     Plaintiff,<br><br> vs.<br><br>CAROLYN W. COLVIN,<br><br>     Defendant. | 4:15-CV-04052-LLP<br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Plaintiff, Robin M. Vermeer (Ms. Vermeer) seeks judicial review of the Commissioner's final decision denying her payment of disability insurance benefits under Title II of the Social Security Act.[1] Ms. Vermeer has filed a Complaint and has requested the Court to reverse the Commissioner's final decision denying her disability benefits and to enter an Order awarding

---

[1]SSI benefits are sometimes called "Title XVI" benefits, and SSD/DIB benefits are sometimes called "Title II benefits." Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference –greatly simplified--is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See e.g. 20 C.F.R. § 404.1520 and § 416.920 (evaluation of disability using the five step procedure under Title II and Title XVI).  In this case, Ms. Vermeer filed her application for Title II benefits only.  AR 179-85.  Her coverage status for SSD benefits expires on December 31, 2009.  AR 19, 220.  In other words, in order to be entitled to Title II benefits, Ms. Vermeer must prove she is disabled on or before that date.

benefits.   Alternatively, Ms. Vermeer requests the Court remand the matter to the Social Security Administration for further hearing.  The matter is fully briefed and has been referred to this Magistrate Judge for a Report and Recommendation.  For the reasons more fully explained below, it is respectfully recommended to the District Court that the Commissioner's Decision be REVERSED and REMANDED.

## JURISDICTION

This appeal of the Commissioner's final decision denying benefits is properly before the District Court pursuant to 42 U.S.C. § 405(g).  Judge Piersol referred this matter to the Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(A)  and Judge Schreier's Standing Order dated October 16, 2014.

## STIPULATED FACTS[2]

**A.    Administrative Proceedings.**

This action arises from Ms. Vermeer's application for Social Security Disability Insurance ("SSDI") benefits protectively filed on June 28, 2012, alleging disability since January 2, 2005, due to bipolar disorder and Attention Deficit Hyperactivity Disorder ("ADHD"). AR 70, 181, 213 (citations to the Appeal Record will be cited by "AR" followed by the page or pages). Ms. Vermeer amended her alleged onset of disability at the hearing to

---

[2]     The stipulated facts were agreed upon and submitted by the parties.  See Doc. 7.  The paragraph numbers have been deleted and a few headings have been altered by the Court.  A few grammatical and/or stylistic changes have been made.  Otherwise, the stipulated facts are recited in this opinion from the parties' submission.  The parties also submitted a joint statement of disputed facts.  Id. p. 21.  The disputed facts deemed relevant and necessary to this Report and Recommendation are incorporated into the "Discussion" section.

November 9, 2006.  AR 55.  Ms. Vermeer's claim was denied initially and upon reconsideration. AR 90, 94.  Ms. Vermeer then requested an administrative hearing.  AR 96.

Ms. Vermeer's Administrative Law Judge hearing was held on July 26, 2013, by the Honorable Denzel Busick ("ALJ"). AR 35.  Ms. Vermeer was represented by different counsel during the hearing.  AR 35.  An unfavorable decision was issued on August 1, 2013. AR 16.

At Step One of the evaluation, the ALJ found Ms. Vermeer had not engaged in substantial gainful activity ("SGA") since the amended alleged onset date of November 9, 2006, through the date of last insurance ("DLI"), December 31, 2009.[3] AR 21.  At Step Two, the ALJ found Ms. Vermeer had severe impairments including supraventricular tachycardia; essential tremor; affective disorder; anxiety-related disorder; substance use disorder; and attention-deficit/hyperactivity disorder.  AR 21.  The ALJ found that Ms. Vermeer did not have an impairment that met or medically equaled one of the listed

---

[3] The Social Security regulations set forth a sequential method of evaluating disability claims.  20 C.F.R. § 404.1520(b). The first step is to determine whether the claimant is engaging in substantial gainful activity. If so, the claim is denied. If not, the second step is to determine whether the claimant has a severe impairment, i.e., an impairment which establishes more than only slight abnormalities that do not significantly limit any basic work activity 20 C.F.R. §404.1521; SSR 85-28. If not, the claim is denied. If a severe impairment is present, the third step is to determine whether it meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App. 1. 20 C.F.R. § 404.1520(d). If it does, a finding of disability is directed. Id. If not, the fourth step is to determine whether the claimant has an impairment that precludes the performance of past relevant work. 20 C.F.R. § 404.1520(f). If not, the claim is denied. Id.  If so, the fifth step is to determine whether the claimant's impairments prevent the performance of any other work, considering residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g).

impairments in 20 C.F.R. Part 404, Subpart P, App 1 (20 C.F.R. § 404.1520(d)) (hereinafter referred to as the "Listings"). AR 21.  The ALJ found Ms. Vermeer had no restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and one episode of extended duration decompensation through the DLI. AR 22-23.

The ALJ determined  Ms. Vermeer had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c). AR 24. Mentally, the ALJ found Ms. Vermeer had moderate limitations in social functioning, as well as in concentration, persistence, and pace. AR 24. The term "moderate" was defined as meaning affected, not precluded, such that a person is performing at lower acceptable limits for most workplaces, and as defined, Ms. Vermeer was at least moderately limited in the ability to interact appropriately or consistently with the public, in getting along with coworkers, and in accepting instruction or criticism from her supervisors. AR 24. The ALJ also found Ms. Vermeer was moderately limited in carrying out detailed or complex instructions, in maintaining extended concentration and in adapting to significant changes in her work routing or work setting. AR 24.  The ALJ stated, "In short, she required work with only brief and superficial contact with others while performing simple, routine and repetitive tasks of about three to four steps on average."  AR 24.

The ALJ considered testimony from Ms. Vermeer's spouse, and found it generally credible, but gave it only limited weight. AR 28.  The ALJ asserted that prior to the amended alleged onset of disability, Ms. Vermeer had been

4

able to achieve SGA level earnings working at skilled jobs despite her mental limitations, but found no SGA work after that time through the DLI. AR 21, 27.

The ALJ noted that Ms. Vermeer's Global Assessment of Functioning ("GAF") score following hospitalization in 2006 was 41, reflecting serious symptoms, but the records failed to include additional GAF scores during the relevant period, and gave limited weight to the score of 41 at discharge. AR 25, 26. The ALJ noted additional GAF scores several months after the DLI, but gave them very little weight because they were from times after her DLI. AR 27.

The ALJ noted the opinion of Karl Oehlke, PA-C, who treated Ms. Vermeer and indicated that she was 100% disabled and incapacitated, and who encouraged Ms. Vermeer to seek disability benefits. AR 27. The ALJ, however, gave the opinion little weight because it was given years after the DLI. AR 27.  The ALJ stated he considered the testimony of the psychologist called to testify at the hearing by Social Security and found his findings consistent with the treatment notes of the treating psychiatrist, Jay Weatherill, M.D., and gave the opinions "heightened weight," but also gave "some credit to the claimant's testimony" and concluded Ms. Vermeer had moderate limits in social functioning and concentration, persistence, and pace during the relevant period. AR 28.  The ALJ considered the state agency's mental consultants' assessments and gave them "notable" weight, finding them consistent with the testifying psychologist and the treatment notes. AR 28.  Based on the RFC determined by the ALJ, the ALJ found at Step Four that Ms. Vermeer was unable to perform her past relevant work. AR 29.  Relying on testimony from a

vocational expert ("VE"), the ALJ found that Ms. Vermeer could perform other work existing in significant numbers, including hospital cleaner and inspector packager. AR 29-30.

Ms. Vermeer timely requested review by the Appeals Council on September 27, 2013, and submitted additional evidence, including letters from Dr. Weatherill, Ms. Vermeer's treating psychiatrist during the relevant period, dated October 8, 2013, and November 1, 2013, in which Dr. Weatherill addressed the severity of Ms. Vermeer's condition during 2006 and following. AR 9, 12.  The Appeals Council's Notice stated it considered the materials listed in its order and also stated, "We also looked at letters dated October 8, 2013, and November 1, 2013, from Jay E. Weatherill, M.D.  However, the Administrative Law Judge decided your case through December 31, 2009, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits." AR 2.  The only evidence listed in the Appeals Council Order is described at Exhibit 13E, representative's brief dated September 27, 2013. There is no Exhibit 13E included in the Appeal Record, but the referenced brief is found at AR 13-14. The Appeals Council denied Ms. Vermeer's request for review on January 7, 2015, making the ALJ's decision the final decision of the Commissioner. AR 1. Ms. Vermeer then timely filed this action.

**B.      Plaintiff's Age, Education and Work Experience.**

Ms. Vermeer was born March 12, 1969, making her 44 years old at the time of the decision, and 40 years old at the DLI. AR 181. Ms. Vermeer's education ended in the 12th grade, which she completed in 1987. AR 260. The ALJ relied on the VE who identified Ms. Vermeer's past work as director, fundraising; personnel recruiter; and sales representative. AR 240. Ms. Vermeer was not working at all during the years 2005 through October 2011. AR 194.  Ms. Vermeer first attempted to work again from October 2011 through sometime in the first quarter of 2012, but she never achieved SGA earnings and ended up being hospitalized in January 2012. AR 187, 199, 201, 209, 357.  A Work Activity Report indicates wages through May 2012, but that report is inconsistent with actual earnings records, which show the job ended sometime in the first quarter of 2012.  AR 187, 199, 201, 209.  Ms. Vermeer testified that the demands of work caused her to have problems focusing, made her head spin, and ultimately led to a manic episode and hospitalization. AR 46.

**C.      Relevant Medical Evidence.**

**1.      Avera McKennan Hospital: (Pre-DLI):**

Ms. Vermeer was admitted to Avera McKennan Hospital on November 9, 2006, with admission diagnoses of psychosis, panic disorder secondary to stressors, and polysubstance dependence. AR 254. Ms. Vermeer was brought in from the Sioux Valley emergency room having a manic episode and her GAF

was assessed at 27. AR 254, 262. Ms. Vermeer was described as quite manic and elevated and had been agitated and angry at the Sioux Valley Hospital ER where she had slapped a nurse, but did not remember doing so. AR 254; see also AR 306-17. Ms. Vermeer's symptoms included no sleep, increased activity, grandiose thoughts, talkative, distractible, elevated mood, feeling worthless, helpless, and hopeless, decreased concentration, mood swings, irritable and paranoid. AR 259. Ms. Vermeer's psychiatric history was noted to include multiple admissions at Avera McKennan Behavioral Health Center, Sioux Valley, and Yankton, SD; attendance at Charter; a history of suicidal activity; participation in the 12-Step Program; and a history of panic disorder and Attention Deficit Disorder ("ADD"). AR 259. Ms. Vermeer's husband said she was crazy. AR 260. She was reportedly molested by her grandfather at age 5; her father was an alcoholic who believed in corporal punishment with a belt and a boot; and she had a history of drug and alcohol use, but was only drinking two martinis per week at the time of admission. AR 260. Following the death of a baby three years prior, Ms. Vermeer went to work at the American Heart Association to try to help the world and make her heart better, because a voice told her to at the funeral of her baby. AR 260.

Ms. Vermeer's other diagnoses noted on admission were superventricular tachycardia, essential tremor, and overweight. AR 254.  Ms. Vermeer was hospitalized from November 9, 2006, through November 16, 2006, and was in group therapy and had medication changes. AR 255. Upon discharge, she was considering the partial or transitional programs, and was discharged in a

stable, but guarded condition. AR 255. Ms. Vermeer was treated while in the hospital by Dr. Weatherill and told to follow up with him following discharge. AR 255, 262.  Following Ms. Vermeer's hospitalization, she continued in the Partial Hospitalization Program from November 17, 2006, through November 30, 2006, consisting of seven visits. AR 289, 291. On November 17, 2006, her GAF was assessed at 41. AR 290. Ms. Vermeer was discharged due to scheduling conflicts and planned to follow up with individual counseling. AR 291. Ms. Vermeer was noted to have some improvement while in the program with improved mood and decreased hyper religiosity/delusional thinking. AR 291.  When seen by Dr. Weatherill on November 30, 2006, Ms. Vermeer reported increased insomnia and agitation with continued problems and scattered thinking. AR 294. She also reported increased obsessive thoughts about spiritual things. AR 294. Dr. Weatherill observed Ms. Vermeer as mildly disheveled, mildly agitated, and cooperative, with an irritable mood and restricted affect and a slight loosening of associations. AR 294. He also observed she was alert, oriented, distracted with limited attention/concentration, and mildly impaired insight/judgment.  AR 294. His assessment was Bipolar I DO mixed with psychosis, and he increased her Seroquel. AR 294.

### 2.   Avera McKennan Hospital: (Post DLI):

On March 8, 2010, a CT of Ms. Vermeer's head was obtained due to positional vertigo, headaches, and uncontrolled tremors. AR 390-91. The scan was unremarkable. AR 391.  Ms. Vermeer was admitted to the Avera

Behavioral Hospital from January 24, 2012, through January 31, 2012, with diagnoses of Bipolar I, most recent episode mixed psychotic features, and again treated by Dr. Weatherill. AR 357, 360. Ms. Vermeer's GAF on admission was 15 to 20. AR 372. Ms. Vermeer had been experiencing increased depression and sadness with some delusions related to a neighbor's infant child, and she had gone to the neighbor's house uninvited to check on the infant. AR 374. She reported sleeping poorly and having a decreased appetite but denied other physical symptoms. AR 374.  Ms. Vermeer was admitted again to the Avera Behavioral Hospital from April 4, 2013, through April 9, 2013, with increased symptoms of decreased mood and feelings she was going to die related to stressors of a recent birthday and the loss of her son 10 years earlier in March. AR 393-95. Ms. Vermeer was again treated by Dr. Weatherill. AR 398. She reported having been sad for the past month. AR 395. She also stated that she had been "functioning well." AR 395. Dr. Weatherill noted that Ms. Vermeer did appear to have some disassociative qualities and was quite slowed in her response, and seemed to get lost at times. AR 395.

### 3. Avera University Psychiatry Associates:

Ms. Vermeer was seen by John Erpenbach, CNP, on February 14, 2005, who noted that she had not been seen for an extended period of time and that she said she was having persistent recurring thoughts of finding her one month old daughter dead in her crib. AR 355.  Mr. Erpenbach related these thoughts to the death of her prior baby. AR 355. Mr. Erpenbach noted continued upper extremity tremor, good eye contact, normal psychomotor

activity other than the tremor, and no suicidal ideation or psychosis. AR 355.
His assessment included depressed mood with obsessive thoughts, stabilizing,
and her Paxil, which had been increased in dosage while hospitalized, was
continued at the higher dose. AR 355.  Ms. Vermeer was seen by Dr. Weatherill
on December 4, 2006, asking to stop the partial hospitalization program and
continue instead with individual therapy because she had a sick child at home.
AR 353. She reported feeling "much better." AR 353. Ms. Vermeer reported
feeling more organized in her thinking, but still has some religious
preoccupation and continued to have occasional problems with attention and
concentration. AR 353. Dr. Weatherill noted she was pleasant, cooperative,
well-groomed, and had good eye contact. AR 353. Ms.  Vermeer's mood was
neutral with restricted affect that was appropriate; her thought process was
logical and goal-directed; and she appeared on the verge of a mild loosening of
her associations, but none were noted. AR 353. Ms. Vermeer was alert and
oriented with intact memory and her attention and concentration were fair, but
she was somewhat distractible and her insight and judgment were impaired.
AR 354. Dr. Weatherill noted that she continued to improve, although she still
had problems with very slight attention and concentration and loosening of
associations and continued religious preoccupations. AR354. Dr. Weatherill
continued her medications, discharged her from the partial hospitalization
program, and scheduled her for individual therapy with Dr. Carol Kuntz.
AR 354.  No therapy records from Dr. Kuntz appear in the Appeal Record.

Ms. Vermeer saw Dr. Weatherill next on December 27, 2006, and reported that her thoughts were more under control and she was more on task. AR 351. Dr. Weatherill described her as generally stable with some recurrence of depressive symptoms. AR 352. Dr. Weatherill recorded that she displayed good attention and concentration and improving insight.  AR 352. Wellbutrin was added to her medications. AR 352.

Ms. Vermeer was seen next on February 5, 2007, and reported doing very well with thought organization, but had a significant problem with weight gain. AR 349. Dr. Weatherill said Ms. Vermeer continued to do very well except for the weight gain, but decided to continue her Seroquel despite the possible side effect of weight gain. AR 350. On March 19, 2007, Ms. Vermeer reported doing very well with more organized thoughts, but she was having some anxiety symptoms related to her supraventricular tachycardia. AR 347. Dr. Weatherill noted that Ms. Vermeer continued to follow with individual therapy. AR 347. Again, Dr. Weatherill noted Ms. Vermeer was doing very well except for problems with weight gain, but again Seroquel was continued despite ongoing concerns over weight gain. AR 350.

Ms. Vermeer saw Dr. Weatherill again on June 18, 2007, and reported doing very well, but she had some increased anxiety during afternoons and some occasional bouts of insomnia, despite taking Ambien nightly. AR 345-46. Dr. Weatherill stated she was generally doing very well with some increased anxiety. AR 346. Dr. Weatherill reduced her Ambien dose and instructed her to take it consistently for one month then to try to discontinue it; he also added

Ativan for her anxiety (the record reflects a hand written notation that this was changed to Klonipin), and reduced her Seroquel in stages with a plan to stop it in two months. AR 346.  When seen on July 30, 2007, Ms. Vermeer was tolerating the decrease in the Seroquel. AR 343. Ms. Vermeer did report that the time immediately before her period she was experiencing unstable moods with anxiety and irritability. AR 343. She reported generally doing very well, but was somewhat hypercritical of herself and feared relapse. AR 343.

Ms. Vermeer was seen again on September 24, 2007, and continued to do very well, but was somewhat self-critical and worried about a mania relapse and was having anxious periods around 19:00 hours. AR 341. Dr. Weatherill noted that Ms. Vermeer had been depression and mania free for over one year and was doing well without Seroquel. AR 342.  On January 8, 2008, Ms.  Vermeer continued to do very well and was stable, but complained of premenstrual dysphoric syndrome. AR 339. She had tried Seraphim or low dose Prozac for this but became very euphoric and was afraid of inducing a mania, so she had some anxiety. AR 339. Ms. Vermeer increased her clonazepam during this time and it helped with her irritability. AR 339. Ms. Vermeer was seen again on April 15, 2008, with similar findings. AR 337-38.

When seen on April 14, 2009, she was again characterized as doing very well, but reported some problems with attention, focus, and concentration, and was avoiding people at times. AR 334. Dr. Weatherill's mental status examination showed that she was pleasant and cooperative; her mood was

neutral and her affect wide range; her thinking logical and goal directed; speech clear and spontaneous with clear associations; her memories were grossly intact, with a good fund of knowledge and language skills; and her insight and judgment were good.  AR 334-35.

Ms. Vermeer was next seen by a psychiatric resident on March 2, 2010, and was questioning her diagnosis of Bipolar. AR 331. Ms. Vermeer also reported a great deal of ADHD symptoms and said that her anxiety and mood were for the most part in good, stable condition. AR331. Her husband verified her statements.  AR 331.

Ms. Vermeer saw Karl Oehlke, PA-C August 26, 2010, and reported she would no longer be taking Ambien because her husband found her eating in the middle of the night, and she apparently started hitting him, but she could not recall any of these events.  AR 329. She also reported being quite discombobulated, with poor focus, poor concentration, quite hyperkinetic, hypervigilant, hyperverbal, and very hard to redirect. AR 329. Ms. Vermeer's valium was increased, her Ambien stopped, and Restoril added.  AR 330.

Ms. Vermeer continued to be seen at the clinic with exams from February 24, 2011, to April 16, 2013. Her treatment was provided by Mr. Oehlke, and she had significant symptoms with GAF assessments between 30 and 50. AR 429-57.  Mr. Oehlke completed a mental limitations form on July 3, 2013, which indicated Ms. Vermeer had multiple marked and moderate mental limitations. AR 426-28. The form does not indicate for what time period Mr. Oehlke believed the limitations existed. AR 426-28.  The ALJ stated that

14

the limitations identified by Mr. Oehlke in the mental limitations form dated July 3, 2013, were consistent with each other; consistent with Ms. Vermeer's contemporaneous GAF scores; and if accepted, would be severe enough to preclude competitive employment. AR 27. But, the ALJ concluded that because the opinions came years after Ms. Vermeer's DLI, they did not support a reduction in her RFC during the relevant period.  AR 27.

Ms. Vermeer's treating psychiatrist from 2006 through her recent hospitalizations, Dr. Weatherill, was contacted after the ALJ denied Ms. Vermeer's claim, and he provided two letters regarding Ms. Vermeer's condition. AR 9, 12.  Dr. Weatherill stated in the October 8, 2013, letter that he initially evaluated Ms. Vermeer in December 2006, at which time she was diagnosed with Bipolar I Disorder, Most Recent Episode Mixed with Psychotic Feature, and it was his opinion that Ms. Vermeer's course of illness had been severe and too debilitating to maintain employment since that time. AR 12. Dr. Weatherill provided additional input in a letter dated November 1, 2013, in which he stated that Ms. Vermeer suffers a severe form of Bipolar Disorder with Psychotic Features; that he first evaluated her in December 2006, and given the severity of her illness, it was his opinion that her psychiatric illness was of the severity that she was unable to work after this initial evaluation in December of 2006. AR 9. Dr. Weatherill went on to explain that Ms. Vermeer's Bipolar I Disorder is sensitive to stressors that destabilize the illness, and work stress would and has led to exacerbations and further decompensation of her Bipolar illness. AR 9. He further explained that the co-morbidities of an Anxiety

15

Disorder and Attention Deficit/Hyperactivity Disorder and their treatments also complicated and worsened the prognosis of Ms. Vermeer's condition.  AR 9.

Dr. Weatherill added that records do indicate that Ms. Vermeer's Bipolar illness had improved and stabilized at various times during the course of her illness; however, the nature of Bipolar I Disorder consists of periods of stabilization followed by exacerbations often caused by stress, and he reiterated that stress included work in Ms. Vermeer's case.  AR 9.

### 4.    State Agency Assessments.

The state agency mental health experts evaluated the file on October 16, 2012, and again on December 4, 2012, and concluded both times that Ms. Vermeer had severe impairments including affective disorder, anxiety disorder, and substance addiction disorder.  AR 74, 83-84.  The experts concluded that Ms. Vermeer had mild restrictions in activities of daily living, moderate difficulties in maintaining social functioning, moderate limitations in concentration, persistence, or pace, and no repeated episodes of decompensation of extended duration. AR 74, 84.  The experts concluded that Ms. Vermeer has moderate limits in her ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without

an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and to be aware of normal hazards and take appropriate precautions. AR 75-76, 86-87.  The expert at the initial level noted that Ms. Vermeer had counseling, but any related records do not seem to appear in the record. AR 75-76.

**D. Hearing Testimony.**

**1. Ms. Vermeer's Testimony:**

Ms. Vermeer testified that she was 44 years old, completed high school in Beaver Creek in 1987, and attempted college, but left due to poor grades. AR 40-41.  Ms. Vermeer testified she worked in customer service for Citibank, and during that time she suffered from anxiety and depression.  AR 41. She said she had attempted suicide while at Citibank and had to be resuscitated, and she left that job because she was embarrassed.  AR 42.  Ms. Vermeer testified she then worked at Gateway selling computers on incoming calls. AR 42. She said that job started out well, but after a couple of years she started getting overwhelmed with even the basic skills to get ready for her day, and she was asked to resign due to absences. AR 43.  Ms. Vermeer said she next worked as a head hunter at Management Recruiters, and again she did well initially, but became inconsistent and overwhelmed, and she quit before she was asked to resign.  AR 43-44.

Ms. Vermeer testified that she lost a son in 2003 and after that she attempted to go back to work a couple of jobs, but she was a failure. AR 44. Ms. Vermeer testified she also worked for her brother-in-law, and that she worked for a short time, but lost her ability to focus and left the job by mutual agreement with her brother-in-law. AR 44-45. Ms. Vermeer testified she then worked at the American Heart Association doing fundraising, and did one successful gala but then quit because her head was not working and she could not focus or do basic tasks, making her very inconsistent. AR 45.

Ms. Vermeer testified she first attempted work again in 2011 at Management Recruiters, in the same head hunter job she had done previously. AR 45-46. She again had problems with her head spinning and not being able to focus, and she ended up being hospitalized with a manic episode. AR 46. Ms. Vermeer explained that when she had the extreme manic episodes she did not remember what she did, but was told that she got aggressive, punched a nurse, dumped her purse when asked for an ID, and threw a can of pop across the room. AR 46-47.

With respect to the 2012 episode, Ms. Vermeer explained that she was convinced her neighbor's baby was going to die and went to their house uninvited, opened the door, and wanted to hold their baby. AR 47-48. The neighbors called the police and Ms. Vermeer was taken to the hospital. AR 48.

Ms. Vermeer explained that since her son died, she has had problems with the color blue because her son was blue because of his heart. AR 47-48. For example, when her daughter's fingers or lips get blue because she is cold,

18

"it just triggers something in [Ms. Vermeer's] head." AR 47-48.  Ms. Vermeer testified that after her son died she "could not cope," so she used alcohol to medicate herself. AR 48. She would drink every night because she thought it was a good self-medication. AR 48. She testified at the time of the hearing she had reduced her drinking to only one drink with meals on weekends, but had drunk to excess about three months earlier.  AR 48.

Ms. Vermeer testified that she had attempted suicide around ten times. AR 41. Ms. Vermeer said that she had been admitted to the Charter Hospital, and to Fourth Floor McKennan about 13 times (the psychiatric unit of what is now Avera McKennan Hospital was commonly referred to as "Fourth Floor McKennan"). AR 41-42. Ms. Vermeer said this occurred when she was 22-24 years old. AR 42.

The ALJ observed that Ms. Vermeer had a tremor as she was sitting in the hearing and asked her about the tremor. AR 64. Ms. Vermeer testified she had an essential tremor, and that when talking with people she felt they would get concerned and want to ask her about it. AR 64. Ms. Vermeer also testified that her tremor gets worse when she is under stress.  AR 64.

**2. Ms. Vermeer's Husband's Testimony:**

Ms. Vermeer's husband, Michael Vermeer, testified that he had been married to Ms. Vermeer for 13 years. AR 49.  Mr. Vermeer testified that in November 2006 when Ms. Vermeer was hospitalized, she had been very confused, asked a lot of questions, and appeared to be looking at something behind him like she was looking right through him, like a vacant stare.  AR 49.

19

Mr. Vermeer testified that even before the 2006 episode Ms. Vermeer's work history had already been inconsistent.  AR 51. He did not have a doubt, based on his observations of her functioning over the period of time, that she would be able to obtain a job, because she was a very dynamic, charismatic person. AR 52. But because of her highs and lows or ups and downs, she would then have problems.  AR 52.  Mr. Vermeer explained that when Ms. Vermeer did attempt to return to work with the recruiting job where she had worked previously, the employer really liked her and wanted her back so they were willing to give her the opportunity. AR 52-53.  He testified that Ms. Vermeer began having problems focusing and staying on task, and the employer tried giving her more direction, but Ms. Vermeer struggled with that and had some ups and downs so that basically within a few months she ended up back in the hospital.  AR 53. Mr. Vermeer testified that he felt the work attempt was definitely a contributing factor to the relapse: needing to dress up for work, be there eight hours per day, and trying to be consistent all eight hours exacerbated her symptoms.  AR 53.  Mr. Vermeer testified that he felt the hospitalization in 2013 may have been related to the time of year relative to their son's death.  AR 53-54. He explained that Ms. Vermeer always had erratic behavior around that time of year since the death, and he would try to reduce the amount of stress at home, keep Ms. Vermeer away from stressful situations, and be encouraging to Ms. Vermeer during that two-month period. AR 54.  Mr. Vermeer testified that he was used to Ms. Vermeer's tremor, but

20

stressful situations would get it started, it was usually worse in the morning, and it had been a problem in the 2006 to 2009 time period also.  AR 65.

### 3. Medical Expert's Testimony:

James Bruce, Ph.D., a psychologist, testified telephonically as an expert called by Social Security to the hearing.  AR 56, 176. The hearing notice stated that the records provided to Dr. Bruce for review were the "pertinent medical exhibits." AR 135. Dr. Bruce testified that Ms. Vermeer's presentation at the ER in 2006 was "significant and disabled," but the doctor's contacts "seem to be recorded as good improvement, stable, doing well" through 2010. AR 57. Dr. Bruce testified that between 2006 and 2009, Ms. Vermeer had mild to moderate limitations in social functioning, concentration, and persistence and pace, and explained that the reason he gave that range was that "there is little information concerning that.  She was reported as doing well. She expressed fear, had some anxiety, although doing very well, continues to do very well, generally doing very well. Generally doing very well, that is the subjective opinion of the provider during that time." AR 58. Dr. Bruce testified that the fact that Ms. Vermeer was not working from 2006 to 2009 would likely have reduced her stress and improved her function, so he really did not know what Ms. Vermeer would have been like had she been working or attempting to work.  AR 59.

### 4. Vocational Expert Testimony:

The ALJ's first hypothetical was to assume the following:

...a hypothetical individual who essentially has no major physical limits and should be able to work at least up in the medium level

of work. They would at all times have some mild to moderate limits on social function, concentration, persistence and pace. And based on testimony I've heard, I'm going to say it's, it's generally going to be in the moderate range, assuming that initially that you have a person – and when I use the term moderate I should define that. I mean, it's affected not precluded at such the person may be performing but doing so at lower acceptable limits for most workplaces.

Given that, you have a person who would be at least moderately limited in the ability to interact appropriately or consistently with the public, in getting along with her coworkers, and in accepting instruction or criticism from their supervisors; also likely moderately limited in the ability to carry out detailed or complex instructions and the ability to maintain extended concentration; and in the ability to adapt to significant changes in their work routine or their work setting. In short, you would have a person who would be best described as an individual requiring work where they have only brief and superficial contact with other people while performing simple routine and repetitive tasks of about oh, three to four steps on average.

AR 60-61. The VE testified that the individual would be limited to unskilled work and not able to perform any of Ms. Vermeer's past relevant work.  AR 61.

The VE testified there would be unskilled jobs the individual could perform and identified the specific jobs of hospital cleaner and inspector/packager.

AR 61-62.  The ALJ then set forth a second hypothetical:

[C]hange the hypothetical such that you have a person whose pattern of presentation is not consistent on an intermittent unexpected basis and let's assume they may reach some marked levels of impairment socially, as well as in concentration, persistence, and pace. When I use the term marked, I mean they're falling below acceptable standards for most workplaces.

And let's assume that they may have an episode approximately every six weeks to two months which could occur at work such that they react to a marked degree in dealing with either the public, coworkers, or supervisors to the point that they express themselves in a harsh manner towards other people, and this could occur even with supervisors where they use inappropriate language or basically react inappropriately. If that happens every

22

six to eight weeks on average, would such a person be able to
maintain these kinds of jobs?

AR 62. The VE testified that such a person would be unable able to maintain

work.  AR 62.

The VE also testified that if people around an individual thought the

individual was acting in a bizarre or odd fashion and it went on for a matter of

hours, or if the person broke down, started crying, and it went on for an hour,

the individual could not maintain employment.  AR 63.  When the VE was

asked about the impact of Ms. Vermeer's essential tremor on the

inspector/packager job, he testified the tremor might interfere with that job.

AR 67.  He also testified that in the hospital cleaner job a person would be

exposed to the public, but would not need to interact with them. AR 67.  But if

a person initiated uninvited contact like trying to provide care to a child similar

to Ms. Vermeer's experience with her neighbor, they would be disciplined right

away.  AR 67-68.

**E.     Other Evidence.**

The Hearing Notice states that pertinent medical exhibits were provided

to the medical expert. AR 161.

## DISCUSSION

**A.     Standard of Review.**

When reviewing a denial of benefits, the court will uphold the

Commissioner's final decision if it is supported by substantial evidence on the

record as a whole.  42 U.S.C. § 405(g); Woolf v. Shalala, 3 F.3d 1210, 1213

(8th Cir. 1993).  Substantial evidence is defined as more than a mere scintilla, less than a preponderance, and that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975).  "This review is more than a rubber stamp for the [Commissioner's] decision, and is more than a search for the existence of substantial evidence supporting his decision." Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989) (citations omitted).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting  it. Woolf, 3 F.3d at 1213.   The Commissioner's decision may not be reversed merely because substantial evidence would have supported an opposite decision.  Id.   If it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000)(citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g).  Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis.  Erroneous interpretations of law will be reversed.  Walker v. Apfel, 141 F.3d 852, 853

24

(8th Cir. 1998)(citations omitted).   The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  Smith, 982 F.2d at 311.

**B.     Burden of Proof.**

The Plaintiff bears the burden of proof at Steps One through Four of the Five-Step Inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt,  204 F.3d at 852; 20 C.F.R. § 404.1512(a).[4] The burden of proof shifts to the Commissioner at Step Five.  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices." Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting at Step Five has also been referred to as "not statutory, but . . . a long standing judicial gloss on the Social Security Act." Walker v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987).

**C.     The Parties' Positions.**

Ms. Vermeer asserts the Commissioner erred by finding her not disabled within the meaning of the Social Security Act.  She asserts the Commissioner erred in three ways:   (1) the Commissioner failed to properly evaluate new and material evidence from the treating psychiatrist which was submitted to the Appeals Council; (2) the Commissioner's determination of Ms. Vermeer's RFC is not supported by substantial evidence; and (3) the Commissioner failed to properly evaluate Ms. Vermeer's credibility.

The Commissioner asserts substantial evidence supports the ALJ's determination that Ms. Vermeer was not disabled during the relevant time frame, and the decision should be affirmed.

---

[4] See footnote 3, supra for a description of the Five-Step inquiry.

**D.   Analysis.**

Ms. Vermeer's arguments are addressed in turn below:

**1.  The Commissioner's Evaluation of the Evidence Submitted to the Appeals Council.**

When the Appeals Council denies review of an ALJ's decision after reviewing new evidence, "we do not evaluate the Appeals Council's decision to deny review, but rather we determine whether the record as a whole, including the new evidence, supports the ALJ's determination." Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir.2000).  After receiving the ALJ's decision Ms. Vermeer submitted additional  evidence to be considered by the Commissioner's Appeals Council.  Specifically, Ms. Vermeer submitted:

1.   Letters from Dr. Jay Weatherill  dated October 8, and November 1, 2013, (respectively) (AR 9 and 12); and

2.   Counsel's letter brief dated September 27, 2013 (AR 13-14).

The Appeals Council refused to consider this evidence as a basis for reversing the ALJ's decision because the Council explained the ALJ decided her case for the time period through her DLI (December 31, 2009) and the letters from Dr. Weatherill were "about a later time."  AR 2.  Ms. Vermeer asserts this was error.

Dr. Weatherill's October 8, 2013 letter stated the following:

> This correspondence is in reference to Robin Vermeer, whom I initially evaluated in December 2006 at which time she was diagnosed with Bipolar I Disorder, Most Recent Episode Mixed with Psychotic Features.  In my opinion, Mrs. Vermeer's course of illness has been severe and too debilitating to maintain employment since my initial evaluation.

> Thank you for your attention to this matter. If I may be of more assistance, please feel free to contact me.

See AR 12.  Dr. Weatherill's November 1, 2013 letter stated the following:

> Mrs. Robin Vermeer suffers a severe form of Bipolar I Disorder with Psychotic Features. I first evaluated here in December 2006.  Given the severity of her illness, it is my opinion that her psychiatric illness was of the severity that she was unable to work after this initial evaluation in December of 2006.

> Mrs. Vermeer's Bipolar I Disorder is sensitive to stressors that destablilze her illness.  Work stress would and has led to exacerbations and further decompensation of her Bipolar illness. The co-morbidities of an Anxiety Disorder and Attention Deficit/Hyperactivity Disorder and their treatments also complicate and worsen the prognosis of Mrs. Vermeer's condition.

> Records indicate that Mrs. Vermeer's Bipolar illness has improved and stabilized at various times during the course of her illness. However, the nature of Bipolar I Disorder consists of periods of stabilization followed by exacerbations often caused by stress.  I reiterate that stress includes work in Mrs. Vermeer's case.

> Thank you for your attention to this matter.

See AR 9.

The Commissioner's regulation regarding submission of new evidence on appeal from an ALJ's decision states:

> If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision.  The Appeals Council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision.  It will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.

See 20 C.F.R. § 404.970(b).  If a claimant submits additional evidence that is "(a) new, (b) material, and (c) relates to the period on or before the date of the

27

ALJ's decision" then the Appeals Council must consider that evidence."
Whitney v. Astrue, 668 F.3d 1004, 1006 (8th Cir. 2012).  Failure of the Appeals
Council to consider evidence may form the basis for a remand.  Id.

Evidence is "new" if it is not simply cumulative of other evidence already
in the record.  Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000).  If the
evidence contains more specific findings than other records already in the
record or if the evidence contains conclusions not otherwise supported by other
evidence in the record, then the evidence is "new."  Williams v. Sullivan, 905
F.2d 214, 216-17 (8th Cir. 1990).

Evidence is "material" only if it is "relevant to the claimant's condition for
the time period for which benefits were denied."  Bergmann, 207 F.3d at 1069.
"Material" evidence does "not merely detail after-acquired conditions or post-
decision deterioration of a pre-existing condition."  Id. at 1069-70.

In Bergmann, a medical report of the claimant's treating physician was
submitted after the ALJ's decision.  Id. at 1067-68.  The pre-hearing reports
from this physician detailed the claimant's diagnosis for longstanding
depression and documented an ongoing deterioration in that condition.  Id. at
1070.  The post-hearing records from the physician that were submitted to the
Appeals Council contained more specific and conclusive diagnoses regarding
the claimant's disability and work capacity.  Id.  The court held that it was
error for the Appeals Council to refuse to consider these records.  Id.  The
evidence was "new" because it described deterioration and, for the first time,
provided a conclusive determination of disability and inability to work.  Id.  The

28

court held the evidence was also "material" because, although the deterioration occurred over the entire course of treatment by the physician, it included periods before the ALJ's decision.  Id.

Here, the court comes to the same conclusion.  Ms. Vermeer's bipolar condition was longstanding and existed long before the ALJ issued his decision. It was a mental illness for which Ms. Vermeer received treatment from Dr. Weatherill  both before and after her DLI. AR 9.  As explained in Dr. Weatherill's letters, the nature of bipolar disorder is that it consists of periods of stabilization followed by exacerbations often caused by stress.  Id. Dr. Weatherill (and Ms. Vermeer's husband Michael) explained that in Ms. Vermeer's case, that stress includes the everyday pressures of being a member of the workforce such having to act and dress appropriately on a daily basis and stay focused and on task for eight hours each day.  AR 9, 53.

The medical expert (Dr. Bruce) observed during the administrative hearing that Ms. Vermeer's medical records indicated she'd been "doing well" between 2006 and 2009, and he applied those findings in the medical records to the "B" criteria of the Listings (activities of daily living, social functioning, concentration, persistence and pace).  AR 59.  The expert's testimony was ultimately incorporated by the ALJ to formulate Ms. Vermeer's RFC.  AR 23.

Dr. Bruce was asked, however, whether the fact that Ms. Vermeer had not worked between 2006 and 2009  "resulted in a reduced stress and improved function."  AR 59.  Dr. Bruce indicated it was "likely" that because Ms. Vermeer was not working during that time, her function was indeed

improved.  Id.  And, he agreed that "*we don't really know what she would have been like had she been working during those years.*"  Id.

The Commissioner urges the court to reject Ms. Vermeer's suggestion that remand is necessary  because post-hearing treating physician letters were not treated as new and material in McDade v. Astrue, 720 F.3d 994 (8th Cir. 2013).  In McDade, the claimant's treating neurologist wrote a post-hearing letter to the Appeals Council expressing the opinions that (1) the claimant was unable to work; and (2) that he was not faking his symptoms, was doing the best he could, and had significant physical restrictions.  Id. at 1000.  In McDade, the Court decided the ALJ's decision was supported by substantial evidence (including the letter submitted to the Appeals Council) because the ALJ had already incorporated the restrictions articulated by the neurologist by limiting the claimant to sedentary work, and the neurologist's opinion that the claimant "had become unable to work on March 14th, 2009" was not entitled to deference because it was a judgment reserved for the Commissioner.  Id. (citing Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)).

The Commissioner also likens this case to Perks v. Astrue, 687 F.3d 1086 (8th Cir. 2012).   In that case, the court rejected the claimant's assertion that the Commissioner improperly denied review of his case after he submitted additional evidence.  Id. at 1094.  In Perks, the claimant submitted a letter from his family physician and a copy of an MRI of his spine to the Appeals Council after the ALJ issued his decision.  Id. at 1093.  Though the actual MRI was not in the record before the ALJ issued his decision, the opinions of the

30

physicians who had reviewed and referred to the report were in the record.  Id.
And though the claimant alleged his family physician treated him for his back
pain, he produced no medical records to support this claim.  Id. at 1090.  The
Eighth Circuit therefore found that the family physician's opinions were
unsupported by clinical or diagnostic data, and therefore his opinion did not
"lead to the conclusion that the ALJ would have reached a different result or
that the ALJ's decision is unsupported by substantial evidence in the record as
a whole."  Id.  at 1094 (citing Kitts v. Apfel, 204 F.3d 785, 786 (8th Cir. 2000)).

      The court does not find McDade or Perks persuasive in this instance.
First, though Dr. Weatherill does express an opinion about an issue reserved to
the Commissioner (Ms. Vermeer's employability) in both letters, that is not
sufficient reason to disregard the letters altogether.

>       Statements that a claimant [cannot] be gainfully employed are not
>       medical opinions but opinions on the application of the statute, a
>       task assigned solely to the discretion of the Commissioner.  A
>       treating physician's opinions must be considered along with the
>       evidence as a whole, and when a treating physician's opinions are
>       inconsistent or contrary to the medical evidence as a whole, they
>       are entitled to less weight.

Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002) (citations omitted,
punctuation altered).  It is error to completely disregard a treating physician's
opinion about disability, however, when the opinion is "part of a larger medical
record" which supports the treating physician's conclusion and when the only
opposing evidence is supplied by a non-treating, non-examining Disability
Determination Services (DDS)  physician.  Cox v. Barnhart, 345 F.3d 606,
609-10 (8th Cir. 2003).

31

Second, the court is not persuaded that the opinions articulated by Dr. Weatherill's letters are otherwise fairly represented by the ALJ's formulation of Ms. Vermeer's RFC.  The ALJ indicated  Ms. Vermeer was "moderately limited" in her ability to interact with the public, get along with co-workers, accept instruction and criticism, maintain concentration, and adapt to significant change in the workplace.  AR 24.  But Dr. Weatherill explained stressors including work-related stressors caused Ms. Vermeer to "destabilize" and "decompensate."  AR 9.  Those two terms are not the equivalent of moderate limitations.

The two letters Dr. Weatherill submitted to the Appeals Council are material because they pertain to the period of time at issue (2006 through 2009).  The information is new because none of her other medical providers were asked to answer the question, and none of them did so spontaneously.

Ms. Vermeer provided this missing piece of important evidence to the Appeals Council from the person in the best position to provide it— Dr. Weatherill--the psychiatrist who was her treating physician during the relevant time frame.  This information from Dr. Weatherill, had it been properly treated as new and material evidence by the Appeals Council, may have provided the substantial evidence Ms. Vermeer needed to support her claim for disability benefits.

This is because "[g]enerally, a treating physician's opinion is given more weight than other sources in a disability proceeding."  Anderson v. Astrue, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)).

32

> Indeed, when the treating physician's opinion is supported by proper medical testing and is not inconsistent with other substantial evidence in the record, the ALJ *must* give the opinion controlling weight . . . However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.

Id. (citations omitted, punctuation altered, emphasis added).  "Ultimately, the ALJ must 'give good reason' to explain the weight given the treating physician's opinion."  Id. (citing 20 C.F.R. § 404.1527(c)(2)).   Additionally, SSR 96-2p instructs that,

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically accepted clinical and diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927.  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

> See SSR 96-2p, POLICY INTERPRETATION, at p. 6.

Conversely, the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence. "We have stated many times that the results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision." Cox v. Apfel, 345 F.3d 606, 610 (8th Cir. 2003) (citations omitted).  "This is especially true when the consultative physician is the only examining doctor to contradict the treating physician." Id. Likewise, the testimony of a vocational expert who responds to a hypothetical based on such

33

evidence is not substantial evidence upon which to base a denial of benefits.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (internal citations omitted).

The factors to consider for assigning weight to medical opinions are set forth by regulation:

(c) How we weigh medical opinions.  Regardless of its source, we will evaluate every medical opinion we receive.  Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

(1) Examining relationship.  Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of treatment relationship and frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we give the source's opinion more weight that we would give it if it were from a nontreating source.

(ii) Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical

opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories. *****.  When the treating source has reasonable knowledge of your impairment(s) we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Support ability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all the pertinent evidence in our claim, including opinions of treating and other examining sources.

(4) Consistency.  Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization.  We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

See 20 C.F.R. § 404.1527(c) (emphasis added).

In Ms. Vermeer's case, the ALJ gave "notable weight" to the opinions of the non-treating, non-examining state agency consultants in order to find Ms. Vermeer was not disabled.  AR 28.  But he did not have the benefit of the opinion of the treating physician (Dr. Weatherill).

35

The ALJ indicated Ms. Vermeer's treating (though non-acceptable) medical source opinion regarding her condition *after* her DLI (Karl Oehlke), is internally consistent and is consistent with Ms. Vermeer's GAF scores.  AR 27. The ALJ further indicated that if accepted, Mr. Oehlke's opinion would establish Ms. Vermeer is unemployable.  Id.  The ALJ further opined that Mr. Oehlke's opinions "suggest a significant reduction in functioning after the DLI."  AR 27.  But again, the ALJ did not have the benefit of the opinion of Dr. Weatherill—the treating physician--about what effect working would have had upon Ms. Vermeer's mental condition during the relevant time.  To his credit, Dr. Bruce candidly admitted during the hearing he did not know what effect work attempts would have had on Ms. Vermeer's mental condition during the relevant time.  AR 59.  The state agency physicians, having never examined or treated Ms. Vermeer, are in no better position than Dr. Bruce to take a guess on the issue.

Dr. Weatherill's  letters to the Appeals Council answered the question that Dr. Bruce admitted was *not* answered by any of the records available to him at the time.  AR 59.  Furthermore, no other medical record establishes what Ms. Vermeer's capabilities would have been during the relevant time if she had been working.   Only Dr. Weatherill's  letters to the Appeals Council do that.   Accordingly, the court finds it was error for the Appeals Council not to consider the additional records submitted by Ms. Vermeer.  Whitney, 668 F.3d at 1006; Bergmann, 207 F.3d at 1069-71.   On remand, the ALJ is directed to

36

take the letters into consideration and to give them appropriate weight when reformulating Ms. Vermeer's RFC.

### 2. The Commissioner's Determination of Ms. Vermeer's RFC.

In this assignment of error, Ms. Vermeer asserts the ALJ's formulation of the RFC is not supported by substantial evidence.   The basis for her claim is that the ALJ's assignment of physical restrictions is not based upon medical evidence.  Specifically, the ALJ identified Ms. Vermeer's essential tremor[5] and supraventricular tachycardia[6] as severe impairments at step two of the five-

---

[5] An essential tremor is a "nervous system disorder (neurological disorder) that causes a rhythmic shaking. Essential tremor can affect almost any part of your body, but the trembling occurs most often in your hands — especially when you try to do simple tasks, such as drinking from a glass, tying shoelaces, writing or shaving. Essential tremor may also affect your head, voice, arms or legs.  Although usually not a dangerous condition, essential tremor worsens over time and can be severe in some people. It isn't caused by other diseases, although it's sometimes confused with Parkinson's disease. Essential tremor can occur at any age but is most common in people age 40 and older." http://www.mayoclinic.org/diseases-conditions/essential-tremor/basics/definition/con-20034509 (last checked October 21, 2015).

[6] "Supraventricular tachycardia (SVT) means that from time to time your heart beats very fast for a reason other than exercise, high fever, or stress. For most people who have SVT, the heart still works normally to pump blood through the body.
Types of SVT include:
- Atrioventricular nodal reentrant tachycardia (AVNRT).
- Atrioventricular reciprocating tachycardia (AVRT), including Wolff-Parkinson-White syndrome.
During an episode of SVT, the heart's electrical system doesn't work right, causing the heart to beat very fast. The heart beats at least 100 beats a minute and may reach 300 beats a minute. After treatment or on its own, the heart usually returns to a normal rate of 60 to 100 beats a minute.
SVT may start and end quickly, and you may not have symptoms. SVT becomes a problem when it happens often, lasts a long time, or causes symptoms.
SVT also is called paroxysmal supraventricular tachycardia (PSVT) or paroxysmal atrial tachycardia (PAT).

step procedure.  It is well-established that in determining a claimant's limitations, the ALJ must rely on some medical evidence; he cannot make his own medical findings.  Shontos v. Barnhart, 328 F.3d 418, 427 (8th Cir. 2002); Clifford v. Apfel, 227 F.3d 863, 870 (8th Cir. 2000).  In Ms. Vermeer's case, the ALJ assigned physical restrictions for Ms. Vermeer's essential tremor and supraventricular tachycardia, but because Ms. Vermeer's Social Security disability application was based solely upon mental impairments, there were no medical opinions in the file which contained residual functional capacity assessments based upon *any* of Ms. Vermeer's physical impairments.

The Commissioner does not quarrel with the basic legal concept that the ALJ is required to base his RFC assessment upon *some* medical evidence, but emphasizes that the ALJ need not rely *only* upon the medical evidence. Besides, insists the Commissioner, Ms. Vermeer should not look a gift horse in the mouth.  After all, the Commissioner could have and perhaps should have,

---

**What causes SVT?**
Most episodes of SVT are caused by faulty electrical connections in the heart. SVT also can be caused by certain medicines. Examples include very high levels of the heart medicine digoxin or the lung medicine theophylline. Some types of SVT may run in families, such as Wolff-Parkinson-White syndrome. Other types of SVT may be caused by certain health problems, medicines, or surgery.
**What are the symptoms?**
Some people with SVT have no symptoms. Others may have:
- Palpitations, a feeling that the heart is racing or pounding.
- A pounding pulse.
- A dizzy feeling or may feel lightheaded.

Other symptoms include near-fainting or fainting (syncope), shortness of breath, chest pain, throat tightness, and sweating."
http://www.webmd.com/heart-disease/tc/supraventricular-tachycardia-overview (last checked October 21, 2015).

the Commissioner suggests, found Ms. Vermeer's essential tremor and
tachycardia to be non-severe.  Docket 11 at p. 8. [7]

Because Ms. Vermeer did not identify any physical impairments in her
application neither she nor the ALJ solicited any opinion evidence about the
physical limitations associated with physical impairments (restrictions on the
time one can sit, stand, and walk during an eight hour work day, for example).
The record, therefore, is devoid of the customary physical residual functional
capacity assessment form upon which the ALJ usually bases his opinion
regarding whether a claimant is physically capable of sedentary, light, medium
or heavy work pursuant to 20 C.F.R. § 404.1567, or which sheds any light on
the effect of Ms. Vermeer's essential tremor or her tachycardia on her ability to
perform work-related tasks.  There is likewise no other information in the
medical record which speaks to these issues.  Because Ms. Vermeer bears the
burden to prove her RFC, the Commissioner argues, she should not be heard
to complain that the Commissioner fudged a little on setting physical
restrictions for impairments she did not even identify in her application, but
which the ALJ gratuitously found to be severe.

The court first addresses the Commissioner's suggestion that the ALJ's
failure to seek out medical evidence should be excused or was harmless
because Ms. Vermeer carried the burden to prove her impairments and RFC.

---

[7] This argument does not gain much ground for the Commissioner, because the
ALJ has the duty to identify all impairments, severe and non-severe, at step
two of the five-step procedure.  See 20 C.F.R. § 404.1520(a)(4)(ii).  The ALJ
must incorporate the physical restrictions imposed by both severe and non-
severe impairments into the RFC at step four.   See 20 C.F.R. § 404.1545(2).

This theory was flatly rejected by the Eighth Circuit in <u>Snead v. Barnhart</u>, 360 F.3d 834 (8th Cir. 2004).  In <u>Snead</u>, the claimant made a claim for disability benefits based in part on his congestive heart failure condition.  The ALJ recognized this condition as a severe impairment but "gave no consideration to what effect this underlying heart condition might have on [his] ability to work."[8] The Eighth Circuit reversed because it found that once the ALJ was aware of the claimant's heart condition, he should have taken steps to develop the record sufficiently to determine how it limited the claimant's ability to work even if the claimant failed to sufficiently do so himself.  <u>Id.</u> at 839.

The Court forcefully explained that unlike normal Anglo-American legal proceedings, Social Security hearings do not rely on the rigors of the adversarial process to reveal the true facts of a case.  <u>Id.</u> at 838 (citing <u>Schaal v. Gammon</u>, 233 F.3d 1103, 1106 (8th Cir. 2000)) (other citations omitted). Instead, in Social Security proceedings, it is the ALJ's duty to find the truth by fully and fairly developing the record, "independent of the claimant's burden to press his case."  <u>Id.</u>  at p. 838 (citations omitted).

> The ALJ possesses no interest in denying benefits and must act neutrally in developing the record. <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 410, 91 S. Ct. 1420, 28 L.Ed.2d 842 (1971) ("The social security hearing examiner, furthermore, does not act as counsel. He acts as an examiner charged with developing the facts."); <u>Battles v. Shalala,</u> 36 F.3d 43, 44 (8th Cir.1994) (noting that the Commissioner and claimants' counsel both share the goal of assuring that disabled claimants receive benefits).

---

[8] The claimant's treating physician offered an opinion on the ultimate issue (i.e. that the claimant "could not work" because of the heart condition, but that opinion was rejected by the ALJ without seeking any clarification or further support for it.  <u>Id.</u> at 839.

Id.   Once the ALJ recognized Ms. Vermeer's essential tremor and supraventricular tachycardia as severe impairments, therefore, it was his duty to develop the record regarding those impairments and their effect upon Ms. Vermeer's ability to work.  Snead 360 F.3d  at 839.

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).   "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)." Cooks v. Colvin, 2013 WL 5728547 at *6 (D.S.D. October 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) abrogated on other grounds, Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must "consider the combination of the claimant's mental and physical impairments."  Lauer, 245 F.3d at 703. Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all the relevant evidence . . . a claimant's residual functional capacity is a medical question."  Id. (citations omitted). "Some medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace."  Id. (citations omitted).  Finally, "to find that a claimant has the [RFC] to perform a certain type of work, the claimant

41

must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered).

In this case, rather than seek out this information, the ALJ inferred and then inserted his own medical findings. This practice is "forbidden by law." Pate–Fires v. Astrue, 564 F.3d 935, 947 (8th Cir.2009) (citations omitted). "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir.2000). The ALJ must not "succumb to the temptation to play doctor and make their own independent medical findings." Pate–Fires  564 F.3d at 947 (citations omitted).   An ALJ also "may not draw upon his own inferences from medical reports ." Lund v. Weinberger, 520 F.2d 782, 785 (8th Cir.1975). The Commissioner argues that the ALJ cited to record evidence documenting the existence of the severe impairments. But this does not serve as a substitute for the medical evidence needed to identify the accompanying functional physical limitations presented by those same severe impairments.

In Everson v. Colvin, 2013 WL 5175916 (D.S.D. Sept. 13, 2013) the court explained "when there is no medical evidence in the record, the ALJ cannot simply make something up." Id. at *20.   The Court remanded in part because "[t]he ALJ . . .  fashioned a light duty capacity with limitations for the Plaintiff. There was inadequate basis for those limitations which apparently were

42

formulated by the ALJ without underlying medical evidence." Id. at 1.   This same mistake occurred in this case.   On remand, the ALJ should seek appropriate medical evidence to formulate the RFC.

### 3.  The Commissioner's Evaluation of Ms. Vermeer's Credibility.

Ms. Vermeer's final assignment of error is that the ALJ did not adequately support his finding that her allegations regarding her psychiatric symptoms were "not entirely credible." AR 25.  Specifically, Ms. Vermeer complains the ALJ did not explain what he meant when he said she was not entirely credible "for the reasons explained herein." AR 25.  She believes the ALJ discussed only two relevant factors in the required credibility analysis: medical evidence and work history, (see AR 25-28).  But, Ms. Vermeer argues, the ALJ did not explain why the medical or work history evidence rendered her statements not credible.  See Ms. Vermeer's brief, Docket 9 at p. 14.

This analysis must begin with the principle that the court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  "When an ALJ reviews a claimant's subjective allegations of pain and determines whether the claimant and his testimony are credible, the ALJ must examine the factors listed in Polaski and apply those factors to the individual." Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).  See also Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3).  In this case, the ALJ's credibility analysis begins on page seven of his written decision (AR 25).  It applies some

43

of the Polaski factors and explains how they apply to Ms. Vermeer.  AR 25-28.
The ALJ is not required to "explicitly discuss *each* Polaski factor in a
methodical fashion" but rather it is sufficient if he "acknowledge[s] and
consider[s] those factors before discounting [the claimant's] subjective
complaints of pain." Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996)
(emphasis added).

The appropriate factors to be considered when evaluating whether a
claimant's subjective complaints are consistent with the evidence as a whole
are: (1) the objective medical evidence; (2) the claimant's daily activities; (3) the
duration, frequency and intensity of pain; (3) dosage and effectiveness of
medication; (4) precipitating and aggravating factors; (5) functional restrictions;
(6) the claimant's prior work history; (7) observations by third parties;
(8) diagnosis by treating and examining physicians; and (9) claimant's
complaints to treating physicians.  See Pearsall v. Massanari, 274 F.3d 1211,
1218 (8th Cir. 2001); Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993).

The ALJ did not explicitly cite Polaski but did cite 20 C.F.R. § 404.1529.
AR 24.  Ms. Vermeer acknowledges the ALJ discussed her medical evidence
and work history but she asserts the ALJ failed to adequately explain how
those two factors negatively impacted her credibility.  Ms. Vermeer's primary
criticisms are that the ALJ failed to properly consider her reasons for
infrequent medical care and/or the impact her absence from the workplace had
upon her presentation to her medical providers during the relevant time.  The
Commissioner counters that the ALJ's explanation of his credibility analysis

44

was not "boilerplate" as Ms. Vermeer alleges, is sufficient, and should be affirmed.

The ALJ began by noting that on her alleged onset date, Ms. Vermeer was hospitalized with a GAF of 27,[9] admittedly unable to function "in almost all areas." AR 25.  Immediately after her discharge, her GAF improved to 41[10] but it still reflected "serious symptoms or serious impairment in social, occupational or school functioning." Id.  But, the ALJ observed, her treatment records during the relevant time period from Dr. Weatherill repeatedly noted that Ms. Vermeer was doing "well" or "very well" or that she was improving.  AR 26.  The ALJ also noted that throughout the relevant time period, the frequency of her visits with Dr. Weatherill decreased.  Id.  The ALJ observed that "some months after" her DLI, Ms. Vermeer reported an increase in psychological symptoms and ultimately was hospitalized in 2012 and 2013.  AR 26-27.   The ALJ concluded that Ms. Vermeer's condition worsened after her DLI.  AR 27.

The ALJ also commented on Ms. Vermeer's work history.  He noted that despite her claim of longstanding mental health problems, she was previously

---

[9] GAF is an acronym for  Global Assessment of Functioning.  A GAF score of 27 indicates "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g. sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g. stays in bed all day, no job, home or friends.). https://u.osu.edu/granello.1/files/2009/04/GAF-scale.pdf (last checked October 23, 2015).

[10] A GAF score of 41 indicates severe symptoms.  "(e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g. no friends, unable to keep a job). https://u.osu.edu/granello.1/files/2009/04/GAF-scale.pdf (last checked October 23, 2015).

able to work at SGA levels despite her mental impairments.  AR 27.  He considered her longitudinal work history.  He considered Ms. Vermeer's testimony that her mental symptoms worsened after her son's death in 2003, but stated "though that may be true, she achieved SGA in skilled occupations during multiple years, including the year following her son's death."  AR 28.

Though this is a closer call than the first two issues Ms. Vermeer presents on appeal, the court believes that the credibility issue should be re-evaluated on remand.  The key is the ALJ's statement in the credibility analysis wherein he states "[a]t hearing, her representative suggested that her unemployed status may have resulted in reduced stress and improved functioning, and there is no way to know what the claimant would have been like had she been working.  While this argument is plausible, Dr. Bruce's testimony and treatment notes covering the relevant period demonstrate an ability to perform at least some work. "  AR 28.  There are two reasons why this reasoning is erroneous in deciding Ms. Vermeer's credibility.

First, a different analysis applies regarding the significance of the lack of treatment as it pertains to Ms. Vermeer's credibility.  Some of the Polaski factors, and in turn the factors enumerated in 20 C.F.R. § 404.1529(c)(3) pertain to the claimant's medical treatment.  For example, the ALJ is to consider the type, dosage and effectiveness of the claimant's medications, and the treatment she has received to alleviate her condition.  See 20 C.F.R. § 404.1529(c)(3)(iv) & (v).

There is, however, another directive in the form of a Social Security Ruling (SSR) which guides the ALJ when he or she considers the effect of the lack of treatment or failure to follow prescribed treatment should have on the credibility determination.  SSR 96-7p addresses the credibility determination and how the adjudicator should consider each of the factors listed in 20 C.F.R. § 404.1529(c).  As to the consistency of medical care and adherence to recommendations, SSR 96-7p states in relevant part:

### Medical Treatment History

In general, a longitudinal medical record demonstrating an individual's attempts to seek medical treatment for pain or other symptoms and to follow that treatment once it is prescribed lends support to an individual's allegations of intense and persistent pain or other symptoms for the purposes of judging the credibility of the individual's statements.  Persistent attempts by the individual to obtain relief of pain or other symptoms, such as by increasing medications, trials of a variety of treatment modalities in an attempt to find one that works or that does not have side effects, referrals to specialists, or changing treatment sources may be a strong indication that symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms.

On the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.  However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.  The

explanations might provide insight into the individual's credibility. For example:

- The individual's daily activities may be structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms. The individual may be living with the symptoms, seeing a medical source only as needed for periodic evaluation and renewal of medications.
- The individual's symptoms may not be severe enough to prompt the individual to seek ongoing medical attention or may be relieved with over-the-counter medications.
- The individual may not take prescription medication because the side effects are less tolerable than the symptoms.
- The individual may be unable to afford treatment and may not have access to free or low-cost medical services.
- The individual may have been advised by a medical source that there is no further, effective treatment that can be prescribed and undertaken that would benefit the individual.
- Medical treatment may be contrary to the teaching and tenets of the individual's religion.

See SSR 96-7p, Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, POLICY INTERPRETATION, Medical Treatment History, pp. 11-13.

At the administrative hearing, Ms. Vermeer's lawyer asked the medical expert whether her unemployed status could have contributed to reduced stress and her improved function. AR 59. The expert said this was "likely." Id. Though the question was not explicitly asked, the logical conclusion is that her unemployed status during the relevant time also resulted in less need for visits to her medical providers. This factor should have been considered by the ALJ pursuant to SSR 96-7 when determining Ms. Vermeer's credibility. Ms. Vermeer's less frequent doctor visits are entirely consistent with Dr. Bruce's admission that her unemployed status during the relevant time frame "likely" resulted in less stress and improved function.

Second, in light of the treating physician (Dr. Weatherill's) submission to the Appeals Council, there now *is* a way to evaluate what Ms. Vermeer's functional status would have been like had she been working during the relevant time period.  Dr. Weatherill's opinion should be given appropriate weight and should likewise be considered in determining Ms. Vermeer's credibility as to her statements about her ability to hold a job during the relevant time period.

If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the court should normally defer to the ALJ's credibility determination.  Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003).  The ALJ's credibility determination focused primarily on Ms. Vermeer's infrequent medical care during the relevant time period and that she reported "doing well" when she did seek mental health treatment during that time.  The expert who testified during the administrative hearing, however, admitted that Ms. Vermeer's unemployed status "likely" contributed to her improved functioning and that he did not know how she would have been doing if she had been working during that time period.  AR 59.  From this, the ALJ concluded "Dr. Bruce's testimony and treatment notes covering the relevant period demonstrate an ability to perform at least some [unskilled] work." AR 28.  In this case, the court cannot defer to the Commissioner's credibility determination because it is not supported by substantial evidence. Ms. Vermeer's credibility should be determined anew upon remand.

**E.     Type of Remand.**

For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record.  Ms. Vermeer requests reversal of the Commissioner's decision with remand and instructions for an award of benefits, or in the alternative reversal with remand and instructions to reconsider her case.

42 U.S.C. §  405(g) governs judicial review of final decisions made by the Commissioner of the Social Security Administration.  It authorizes two types of remand orders: (1) sentence four remands and (2) sentence six remands.  A sentence four remand authorizes the court to enter a judgment "affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).   A sentence four remand is proper when the district court makes a substantive ruling regarding the correctness of the Commissioner's decision and remands the case in accordance with such ruling.  Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000).  A sentence six remand is authorized in only two situations: (1) where the Commissioner requests remand before answering the Complaint; and (2) where new and material evidence is presented that for good cause was not presented during the administrative proceedings.  Id.  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record overwhelmingly supports such a finding."  Buckner, 213 F.3d at 1011.  In the face of a finding

50

of an improper denial of benefits, but the absence of overwhelming evidence to support a disability finding by the Court, out of proper deference to the ALJ the proper course is to remand for further administrative findings.  Id., Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be clarified and properly evaluated.  See also Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) (an award of benefits by the court is appropriate only if all factual issues have been resolved and the record supports a finding of disability).  Therefore, a remand for further administrative proceedings is appropriate.

## CONCLUSION and RECOMMENDATION

Based on the foregoing law, administrative record, and analysis, this court respectfully RECOMMENDS to the District Court that Ms. Vermeer's Motion to  Reverse and Remand (Docket 8) be GRANTED; that the Commissioner' Motion to Affirm (Docket 10) be DENIED, and that the Commissioner's decision be REVERSED and REMANDED for reconsideration pursuant to 42 U.S.C. § 405(g), sentence four.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the

51

District Court.  <u>Thompson v. Nix</u>, 897 F.2d 356 (8th Cir. 1990); <u>Nash v. Black</u>, 781 F.2d 665 (8th Cir. 1986).

DATED this 27th day of October, 2015.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge